NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, New Haven Branch of the NAACP

v.

TOWN OF EAST HAVEN, East Haven Board of Education.

No. 3:96CV1050 (PCD).

United States District Court, D. Connecticut.

March 25, 1998.

David N. Rosen, Rosen & Dolan, P.C., New Haven, CT, David L. Rose; Joshua Rose, Washington, DC, for Plaintiffs.

Hugh F. Keefe, Lynch, Traub, Keefe & Errante, New Haven, CT, for Defendants.

### *MEMORANDUM OF DECISION*

DORSEY, District Judge.

Plaintiffs (collectively hereafter "NAACP") seek relief from the Town of East Haven, Connecticut and by amendment the East Haven Board of Education (hereinafter collectively the "Town"). The claim is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiffs allege discrimination in the hiring of Town employees against African–Americans as a group. They seek an order that the Town enhance its recruiting, advertising, testing and hiring practices to attract a greater number of qualified African–Americans to apply for Town employment, enhancing the likelihood of increased African–American employment by the Town. Employment

is not sought for any individual. No damages are sought.

Though disparate treatment is asserted, requiring proof of discriminatory motive and intent, that claim has not been proven. In view of the relief sought, the case will be considered under the disparate impact theory which does not require such proof. See 42 U.S.C. § 2000e–2(k). The parties were fully heard and briefs filed, the last on November 12, 1997.

Plaintiffs claim that the Town has created a substantial disincentive to blacks to apply for Town employment due to a perception of bias, a lack of welcome to blacks as job applicants, and an unlikelihood that black applicants would be fairly considered. It is not contended that these disincentives are the result of affirmative conduct by the Town, nor specifically part of the Town's employment processes. Rather, plaintiffs contend that the Town's hiring process has failed to include an outreach in the form of recruiting and advertising that would overcome the negative perception and successfully prompt job applications by a broad, representative cross-section of the black community which would increase black hiring.

Defendants object to Exhibits 86 and 87. Exhibit 87 contains a list of contributions to the Town Mayoral campaigns of incumbents from 1991 to 1995. As there is evidence of political affiliation between the Mayor and some Town hirees, limited relevance has been shown. Exhibit 87 will be admitted.

Exhibit 86 is a deposition of Greg Maisel and is proffered to demonstrate the efficacy of radio advertising in the Detroit area. As not relevant to the Greater New Haven area, defendants' objection is sustained. Exhibit 86 is not admitted.

## I. FACTS

Plaintiffs are associations which act in protection of the rights of minorities, particularly African Americans. The requisite complaint was filed on April 29, 1992. A right to sue letter issued on February 23, 1993. This action ensued.

East Haven is a municipality in the Greater New Haven area, bounded by New Haven, North Haven, Branford, North Branford and the Long Island Sound. The Town has an economic interdependence with New Haven, of which it is essentially a suburb. The Town population is approximately 26,000, of which, in 1990, 231(.9%) were African–Americans. Most Town residents are employed outside the Town. It is linked to New Haven by city streets and Interstate, I–95. A Transportation District provides public transportation within the Town, to New Haven, and among eight (8) of fifteen (15) towns in the New Haven/Meriden Primary Metropolitan Statistical Area ("PMSA"). The eight include the largest segment of the total PMSA population. The Town is readily accessible from other PMSA and bordering towns by private transportation. The PMSA is the primary source for Town employees.

The Town employs 200 full time, 26 part-time and 83 seasonal persons. On the last roster, 25% were residents of towns other than East Haven, and 75% were Town residents. The Town has no employment residency requirement, nor is there an announced policy of Town resident hiring. According to its Equal Employment Opportunity reports from 1983 through 1996, the Town employed no blacks. The first black was hired in February 1997, as Welfare Director.

The Town Board of Education is a State Agency charged with authority over and responsibility for public school education of East Haven children. It employs about 363 full time and 53 part-time workers. In the PMSA, of all certified teachers and educators reported in the 1990 census (a total of 5,474), 8.7% were black. The PMSA school systems reported 389 black teachers and educators, 7.1% of the total. Of 258 East Haven teachers and educators in 1993, none were black. For an uncertain time in the 1970s and 1980s, the Town employed one black special education teacher, and in 1987 or 1988, a black messenger was employed. Three black part-time tutors were hired in 1994. Each opted for other permanent employment at the end of the school year. A part-time coach and a teachers aide, both black, were

hired in 1996, but as of July 1996 no blacks were employed by the Board. In 1997 two part-time employees were black. The present Superintendent is a Native American.

The 1990 Greater New Haven population, including Bethany, Branford, Cheshire, Clinton, East Haven, Guilford, Hamden, Meriden, New Haven, North Branford, North Haven, Orange, West Haven, Wallingford, and Woodbridge was 525,366 of whom 64,197 (12.2%) were African–Americans. New Haven's 1990 population was 130,474 of whom 47,157 (36.1%) were African–American. That was 73% of the blacks in this region. Of the 78,685 regular employees of private employer establishments in the PMSA, 10,685 (13.6%) were black and 10.7% of the PMSA civilian work force was black. East Haven has two Zip Codes, both of which include small segments of New Haven. The work force of private employers in those two areas which file EEO–1 forms is 17.7% black.

No deliberate discriminatory conduct attributable to the Town was shown to have prevented hiring any individual plaintiff. Three African–Americans, members of plaintiffs, applied for employment by defendants. Two of them, Mr. Brathwaite and Mr. Brayboy, failed to attend scheduled depositions. Their applications were not in evidence. Two plaintiffs, Ms. Brown and Ms. Cain, did not pursue Town employment. Another member of plaintiffs, Mr. Ricardo, was certified after examination. However, he was not recommended by a prior employer and was decertified when charged with sale of cocaine. He remained on the eligible list until he was later murdered.

Mr. Highsmith, a Town resident, requested a job of then Mayor Luzzi. He was a temporary replacement custodian for seven months until the regular custodian returned. He took a maintenance worker examination but did not pass. He faulted the examination for emphasizing plumbing. He correctly answered 15 of the 30 plumbing questions and 79 of the total of 160 questions, resulting in an overall score of 49. For a time he was called for temporary custodian positions, but was never reachable or available. He passed the March 1994 custodian examination, with

which he took no exception, but ranked 17th on the eligibility list.

Edward Jefferson applied for a maintenance position. The test was delayed and he did not take it. He did not reapply for employment with defendants, but remained in a position he took prior to the test. He did not communicate with defendants' agents in person. His application did not disclose his race.

Earl Geyer applied to be a part time fire inspector. He was a full time firefighter/EMT in the New Haven Fire Marshall's office. He had done inspections but never alone. He was not available for emergencies which conflicted with his 42 hour regular work week in New Haven. He was interviewed for a New Haven Fire Inspector's job, but not hired. He was interviewed by the Town Fire Chief who recommended that the job go to Peter Mullen, a retired former Fire Marshall/Fire Chief of Branford. Mr. Mullen had done inspections alone. Before the job was filled, the Fire Chief tried to recruit a specific black New Haven firefighter, but the man did not submit an application.

In the Black Community, according to past and present NAACP Presidents, blacks are perceived as not welcome as Town residents and/or employees, largely based on a lack of black Town residents, the dearth of black Town employees and personal experiences perceived as reflecting discriminatory animus.

The Town's civil service system generally prevents arbitrary hiring. However, some temporary, seasonal and part-time hires are not under civil service. These are limited in number and duration. They can lead to some advantages in applying for civil service appointments. In some cases, candidates may benefit from preferences under collective bargaining agreements or where positions are filled on a promotional basis. Such hirings were not shown to have shut out a black applicant in any specific instance. No records as to black applicants for such positions have been shown. Vacancies in promotional positions are, by collective bargaining contracts, subject to preferential claims by Town employees, leaving outsiders dis-

couraged by a lesser chance of success. A number of Mayoral appointments by the incumbent appeared to have been filled based on professional screening, often with non-residents. There was no evidence of exclusion of any black applicant for these jobs. The evidence suggests that competitive examinations were used for the 53 new hires between 1992 and 1997.

Other than for police and fire, six civil service examinations were administered between 1995 and 1997. Five were for municipal employment and one for the Board of Education. The results follow:

| Position | Applicants | Black Applicants | Examinees | Black Examinees | Overall Passed | Blacks Passed | Black Ranking |
|---|---|---|---|---|---|---|---|
| Truck Driver | 158 | 12 | 96 | 6 | 85 | 2 | 40/50 48/50 |
| Maint. Worker | 122 | 3 | 64 | 0 | 18 | 0 | N/A |
| Admin. Assist. (6/95) | 73 | 3 | N/A | 2 | 54 | 1 | 36 |
| Secretary Bd. of Ed. | 49 | 2 | 36 | 1 | 13 | 0 | N/A |
| Admin. Assist. (2/96) | 62 | 2 | 32 | 1 | 25 | 1 | 24 |
| Mechanic | 19 | 0 | N/A | N/A | N/A | N/A | N/A |

Four were promotional positions. All were filled by persons in the top three on the Civil Service certified list. From 1992 to 1997, of 58 appointments, at most 5 were openly competitive, non-promotional.

Laborer positions in the Public Services Department were not subject to civil service procedures. These positions were filled at Mayoral direction by the Director of Public Works, without advertising, frequently from applicants who appeared at town hall. Of fourteen hired between 1992 and 1997, thirteen were East Haven residents and seven were related to town officials or were politically associated with the administration. Prior to 1992, 79.9% of police and 81% of fire appointees were Town residents. Town residents frequently sought employment through elected/appointed officials. Positions requiring specialized knowledge were not subject to testing.

The Town advertises openings in general circulation newspapers in Greater New Haven. Most recently, $1500 was budgeted for Town advertising and recruiting and $3,000 for the Board of Education. The Town advertised in minority newspapers, including the 1995 police and fire examinations. It eschewed radio advertising which it found not to be cost effective as it would have doubled the advertising cost. Print advertising complies with civil service regulations. The Town has not directly encouraged applicants through minority civic/social organizations. It has posted openings throughout town offices, with various civic (including minority) organizations, and in several commercial bulletin boards in the New Haven/East Haven border area. The Town's posting and advertisements advise of equal opportunity employment and occasionally encouraged minority applications, but not always in language that would encourage black applicants. There is no uniform Town advertising policy.

Boards and Commissions, appointed by the Mayor, are involved in the final selection of civil service employees, usually from among the top three on an eligibility list. No particular civil service list was shown to have involved individual or group discrimination.

Mayoral appointments are usually professional in nature, are limited in number, and are usually advertised.

Teacher vacancies are filled from accumulated applications. One newspaper advertisement per year, placed locally and in D.C., Virginia and California minority publications, announces that applications will be accepted. A similar announcement is made at Southern Connecticut State University and at a local Teachers' Agency. Additional paid advertising is done when there is an inadequate number of applications to fill upcoming vacancies.

Although one effort was made to encourage black aides to stay on as teachers (it did not succeed), no significant outreach has encouraged applications from minorities, such as through minority educators, educator's conferences, minority civic organizations and postings likely to come to the attention of potential minority applicants. There are media which effectively reach substantial, identified minority audiences. The Town has not explored public service announcement availability, such as are sometimes provided by radio.

Teacher appointments are based on reviews of applications by a professional screening committee pursuant to Board of Education promulgated written standards. The committee interviews selected applicants and makes a recommendation to the principal. He or she makes three recommendations to the Superintendent who interviews the finalists and makes a recommendation to the Board. Of teachers hired in 1996, 13(42%) were Town residents when hired, 18 were not. Between 1991 and 1996, of 96 teachers hired, 71(74%) were not Town residents. None were black. No records as to black applicants were shown. Of 99 non-professional school employees as of 1996, 91 (91.6%) were Town residents, while 98% of the part-time cafeteria workers resided in the Town. No records of applicants were

shown. Of 3 black teachers' aides recruited while students at Southern Connecticut State University, none applied in East Haven after graduation. The Board does no minority outreach advertising for non-professional jobs. A black messenger was provided a rehabilitation program but after a short-lived employment, he voluntarily resigned. Three part-time black employees terminated their employment voluntarily.

In a 1992 police examination,[1] 8% of the examinees for East Haven were black. The highest ranked black on the East Haven list was #55. He was not reached for appointment within the two year life of the list. In 1995, when the Town disseminated information concerning the process, the examination for Town police officers attracted 18 black candidates, 3.6% of the total of 258.[2] 12 (2 .5% of the total) were qualified, and 5 took the examination. One black (20% of the black examinees) passed, while 158 non-blacks (62%) passed. The successful black examinee did not show for the agility test and thus was not eligible for appointment.[3] The agency administering the test conducted a 1½ hour preview for candidates to familiarize themselves with the test procedure and sample questions. Each applicant was provided with advice as to training for the agility test, a guidebook for the examination, and a reading list. Recruiting for the examination was not done by the independent administering agency, as had been the case in 1992.

The 1992 and 1995 police tests were developed from the same source using the same criteria to predict success at the police academy. The test has been and is being used by other Connecticut communities. It was allegedly validated by showing that the police academy grades of 39 candidates statistically correlated to their examination scores. Thus the test was claimed to predict accurately

---

1. The police examination (including recruitment) was jointly administered for East Haven and Hamden, with applicants designating the town(s) to which they wished the result to be forwarded.

2. In 1992 when the South Central Justice Administration did the dissemination, as part of the administration of the examination for several towns, 8% of the applicants who registered their examination results with East Haven were black.

3. This fact illustrates the difficulty in drawing inferences from a mere statistic. The failure to show for the agility test is argued by the Town to reflect that the applicant was not genuinely interested in the job. Yet being ranked as low as he was, the prospect of actual employment may have appeared minimal and could have discouraged the applicant from pursuing the process further.

candidates' performances at the police academy. The test scores of 129 college volunteers, with an average of 18 credit hours, compared favorably with their admission test and their college grade point averages. The students had the same high school diploma or GED and were of comparable age and race mix as the applicants. Defendants support the test's validity by pointing to training success as a reflection of necessary job skills.

For a 1995 fire fighter examination, 2.9% of the examinees were black. Of 442 qualified applicants, 13 were black (3%). Of the 326 who took the test, 8 (2.6%) were black. No black passed.

There was no evidence of overt discrimination against blacks as a group, nor against a particular black, in the selection of an employee for any position. The Town has an equal employment opportunity plan in relation to which there was no conduct significantly bearing on the issues here presented.[4]

The PMSA population which is qualified and available for municipal employment is between 15.8% and 20.5% black. The lack of records as to the race of applicants precludes a finding that blacks apply in proportion to their makeup of the relevant job market. Government employment of blacks, state and local, is 16% higher than black private employment, which in the East Haven Zip Codes was 17.7% overall and 47% for service workers. The figures must be tempered by the fact that part of New Haven, with a high black population, is included in that geographic area. Projection of a median expectable black employment level by the Town (at 47%), cannot be justified, but 16–17% could be.

The PMSA private work force overall is 13.6% black, which if applied to East Haven projects a statistical likelihood of 37–38 Town black employees. The disparity between that figure and actual Town black employment is 6.5 standard deviations. Plaintiff's expert expected 15.8% black employment by the Town. Under his most conservative projection of 10.7%, the disparity is 5.1 standard deviations. A somewhat lower disparity is suggested by plaintiff's evidence for professionals and educators, 4.1 standard deviations. Such analyses suggest that the actual level of black employment by the Town is not random. Inferentially, it is the result of a non-random factor unique to the group, the race of its members. The statistics were not disputed by the Town, which argues any adverse inference on the basis that the absence of discriminatory animus in any employment decision weighs against a finding that deviation from the expected norm resulted from discrimination.

Plaintiff offered evidence of several hirings suggestive of favoritism for Town residents, nepotism, lack of merit testing, promotional favoritism for lower ranks Town employees, advancement of part-time employees into full time jobs and political favoritism as evidence of non-merit employment. Temporary and part-time jobs are not advertised. As none of these hirings were shown to have adversely affected a black applicant, they cannot have been a factor in the exclusion of a black from Town employment.

Plaintiffs' counsel advised the Town of its investigation of the Town's hiring, focusing on the dearth of black employment. The Town noted its minority recruiting practices and its intention to pursue minority applicants. Prior to suit, Plaintiffs suggested a consent decree which would require minority radio station advertising, public acknowledgment of the Town's outreach program, acquiescence in prompt court enforcement of the decree, and expense reimbursement including attorney fees. Ex. W. The Town responded that the only area of difficulty in reaching such an agreement would be the question of fees. It asserted that the Town already pursued an active outreach for minority job applicants and would not have difficulty agreeing to do so. Without further pursuit of settlement, this lawsuit was filed.

## II. CONCLUSIONS OF LAW

As a state governmental unit employing more than 15 persons, East Haven is subject to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(a) and (b). Plaintiffs timely filed a complaint and suit after receipt of a

---

**4.** The EEO Officer testified that he had not read the plan to know its details.

right to sue letter. 42 U.S.C. § 2000e–5(f). Plaintiffs' standing has been upheld. *NAACP v. Town of East Haven,* 892 F.Supp. 46, 49–50 (D.Conn.1995), vacated on other grounds, 70 F.3d 219 (1995).

Plaintiffs claim discriminatory impact on blacks from Town hiring practices. They assert that by its hiring practices the Town has caused the number of black employees to be so disproportionate, compared to the black population in the relevant employment market, as to constitute discriminatory impact. Such a claim is within the amendments in the Civil Rights Act of 1991, § 3(3). Pub. 102–166, 105 Stat. 1071 (specifically confirming propriety of disparate impact suits); see *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The claim here is not for specific jobs lost due to discriminatory animus, but for prospective relief. They seek positive outreach, recruiting and encouragement efforts which are allegedly necessary to convince blacks that employment by the Town is truly open to them. In turn, qualified blacks will, hopefully, successfully seek Town employment in open competition. Plaintiffs point to the paucity of blacks in Town employment and among those who succeed in Town job applications.

▇▇▇ Plaintiffs rely on the statistical disparity as "proof of a pattern or practice of discrimination." *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) (citing *Int'l Bhd. Of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). A seemingly neutral practice which results, or tends to result, in a discriminatory hiring pattern may suffice to sustain plaintiffs' burden of proof of a prima facie case of disparate impact. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). "[A] facially neutral employment practice" may violate Title VII in a disparate impact case without evidence of the employers' subjective intent to discriminate. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645–46, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In using a statistical basis for the claim of disparate impact, " 'the proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified .... population in the relevant labor market.' " *Id.* 490 U.S. at 650 (quoting *Hazelwood,* 433 U.S. at 308) (internal quotes, brackets and ellipses in original).

In *Wards Cove,* the plaintiffs compared cannery and non-cannery job holders, members of the former alleging disparate representation of minorities in non-cannery employment. The comparison was faulted for lack of evidence that cannery workers were qualified for non-cannery jobs. One could not infer that the statistical discrepancy in non-cannery employment resulted from discrimination. Absent proof of qualification of cannery workers to perform non-cannery jobs, the discrepancy could have resulted from the cannery workers not being qualified to perform the non-cannery jobs. In such circumstances, discrimination could not reasonably be inferred to explain the discrepancy.

▇▇▇ With evidence of qualification of the group claiming discrimination the remaining distinction between the two classes of employees is race, measured by the statistical discrepancy. In cases of sufficient statistical disparity, it may legitimately be found/inferred that the employment practices which resulted in the discrepancy were discriminatory, i.e. that race was a factor. *See, Sobel v. Yeshiva University,* 839 F.2d 18, 34 (2d Cir. 1988). Plaintiffs may establish a prima facie case "Where 'figures for the general population might ... accurately reflect the pool of qualified job applicants.' " *Wards Cove,* 490 U.S. at 651 n. 6 (citations omitted). This seemingly limited basis to prove disparate impact statistically is subject to a different analysis "if it were found that the dearth of qualified nonwhite applicants were due to practices on [the employer's] part which— expressly or implicitly—deterred minority groups members from applying for noncannery positions." *Wards Cove,* 490 U.S. at 651 n. 7 (citing *Teamsters,* 431 U.S. at 365). Thus "[a]s long as there are no barriers or practices deterring qualified nonwhites from applying for noncannery positions .... if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mecha-

nism probably does not operate with a disparate impact on minorities." *Wards Cove,* 490 U.S. at 653. Non-discriminatory factors in the job market may lead to racial imbalance in a work force. *See, Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *EEOC v. Chicago Miniature Lamp Works,* 947 F.2d 292, 297 (7th Cir.1991).

Excepting the 1995 tests for police and firefighters, and some alleged generalized practices such as nepotism, favoritism for Town residents, and political allegiances, plaintiffs focus on the disparate number of black town employees compared to black employment and presence in the community. Qualification is sidestepped in this approach. Plaintiffs argue that taking Town employment as a whole, the discrepancy is so large that a lack of precisely the same qualifications for Town employment in members of the relevant labor markets is persuasive evidence that discrimination is a factor.

A substantial number, if not most, "public-sector jobs differ from private-sector jobs only in the identity of the employer." *United States v. Town of Cicero, Illinois,* 786 F.2d 331, 335 (7th Cir.1986) (Posner dissenting/concurring). The Town employs secretaries, clerks, custodians, maintenance workers including numerous trades, drivers, mechanics, personnel administrators, data processing personnel, bookkeepers, accountants, personnel supervisors in several fields, laborers, food workers, social workers, medical personnel, etc. Employment in the private sector is substantially comparable although there are some jobs unique to towns and to most private employers.

There has been no direct evidence of purposeful discrimination by the Town in any hiring decision. At most the evidence has shown that Town residents and people involved in the political process have had some entree to the hiring process. Such has not been shown to have excluded blacks from consideration for a particular job, nor to have resulted in jobs being awarded over a black with superior qualifications. Even in the police and firefighter examinations of 1992 and 1995, the claim rests on the statistical results and not on the basis that the tests

were culturally unfair to black examinees. Thus, the question presented is whether the extremely small, close to non-existent, Town black employment, under the circumstances, over the years and even after this action was brought, can be the basis for an inference that discrimination has been a factor in the low level of black employment.

However, "a Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Wards Cove,* 490 U.S. at 657; *Watson,* 487 U.S. at 994. "[A] prima facie violation of the Act may be established by statistical evidence showing that an employment practice has the effect of denying members of one race equal access to employment opportunities." *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). Plaintiffs rely on the Town's near zero black hiring and the practice of hiring without a thorough and effective outreach program which would overcome the black community's perception that the Town is not receptive to black applicants.

Analyzing a disparate impact claim involves three steps: (1) a facially neutral employment practice with a disproportionate impact on an identifiable race, gender, nationality; (2) an employment practice related to the job(s) in question or which serves an important business purpose; (3) if the employer meets (2) plaintiff may show that pretext in the claim under (2).

Plaintiffs do not point to a specific employment practice (applied generally or individually) which is not facially neutral. Their real claim is that there are not enough qualified blacks who get their foot into the application process to permit actual Town black employment to approach a level proportionate to the number of blacks comparably employed in the private sector.

## III. DISCUSSION

[8] he Town's hiring process has been shown to be facially neutral. The testing has not been shown to incorporate discriminatory practices or procedures. No favoritism deprived a black of an otherwise merited job. No black applicant was denied a teaching placement on the basis of race. Although the Town's hiring practices might be subject to question on other grounds, it has been facially neutral. However, it has also resulted in a vast discrepancy across the spectrum of Town employment. The Town's having hired so minuscule a number of blacks, and for substantial periods having had no black employees, reflect hiring practices or procedures which have had a real, substantial and negative impact on blacks. The discrepancy is so far beyond the statistical deviations necessary to draw an inference of race having been a factor, that a prima facie case is found to have been proven.

The Town's explanations for not having hired individuals reflect reasons attributable to the specific black applicants, such as valid disqualification, no-shows for tests and parts of the application process, failures to pass tests (sometimes due to the applicant's personal failures), and low rankings for blacks who passed examinations. Nonetheless, statistical deviations of black employment by the Town from black employment in the private sector in East Haven, in the areas immediately adjacent to and including part of East Haven, and in Greater New Haven, are so large as to overcome the innocuous explanations for the concededly gross statistical discrepancy of black hiring by the Town. Though teacher hiring was not shown to have discriminated against a particular candidate, the result was the same—no black hires. The Town's evidence showed that despite some Town outreach, and awareness of open positions on the part of black teachers, blacks have shunned the Town as a potential employer.

There is a perceived animus against blacks which has discouraged blacks from pursuing Town employment opportunities. Plaintiffs did not substantiate this perception by evidence of specific discrimination against an individual job applicant. This might suggest that a remedy to rectify the discrepancy in black employment is inappropriate, since it results from the failure, if not refusal, of qualified blacks to seek Town employment. That, however, is precisely plaintiffs' point. They have demonstrated a perception in the black community that the Town is closed to black employment, unwelcomingly hostile, and resistant.

The Town has refuted discriminatory treatment of each black who claimed personal animus, and presented evidence of the absence of racial animus in all hiring since 1991. It has not shown that the black community's perception of the Town is not true, nor that it is unfounded. The Town's explanation for its inability to hire blacks (i.e., that there has been a lack of qualified black applicants who successfully pass neutral screening) focuses on what occurs in the hiring process. It does not deal with the necessity to overcome the black community's negative perception with an effort calculated to produce what the Town asserts it seeks: A reasonable number of qualified black applicants such that more blacks will pass the application procedures and be ranked high enough to be hired. The Town's response relies on its use of civil service procedures which are bereft of discriminatory animus. It claims to have refuted any suggestion of consideration of race as to each individual whose effort to obtain town employment was the subject of evidence. Further, it claims to have shown that no precedence is given to Town residents and that while political association with the Mayor's party might have provided an entree to the hiring process, it has not advantaged any applicant over any black applicant. It asserts that it has refuted any implication that consideration of race has resulted in the absence of hiring of blacks, and claims to have shown that the lack of qualified black applicants is the cause of the dearth of black hiring.

As the Town notes, the number and quality of black applicants for town employment is low. Therein lies a simple answer to plaintiffs' complaint. The Town does not actively avoid, restrict or limit fair consideration of blacks. The question is whether a remedy for the dearth of black employment by the

Town is legally warranted. According to the Town, the racial disparity of employment stems from the paucity of qualified black applicants and plaintiffs must prove an affirmative relation between the Town's conduct and the evident adverse impact. Yet the paucity of qualified black applicants may prove plaintiffs' point, since the blacks who have applied do not appear to have been a fair cross section of the black community. This assumes, of course, that a fair cross section of the black community would be sufficiently qualified to produce a proportionate number of black hirees. In other words, it assumes that the black community includes a proportional number of qualified persons.

Although such parity has not been established on the record, and is not assumed, test discrepancies between blacks and non-blacks are so far beyond predictable statistical deviations that one may legitimately infer that race was a factor. If a truly representative sample of blacks applied for Town jobs, their test scores would be comparable to non-blacks. In turn they would be ranked and qualified proportionally with non-blacks for hiring. The question is whether, to overcome black reluctance to apply for Town jobs the Town can be ordered to undertake an outreach program.

## IV. CONCLUSION

■ Plaintiffs have established a prima facie case. The number of black Town employees has been drastically deviant, by 3.8 to 7 standard deviations, from statistics which would appropriately measure a reasonably expectable proportion of black Town employees. These would include the census data on blacks in Greater New Haven, the percentage of black employees in the PMSA and the relevant job market, the proportion of blacks in private employment in the Town and the adjacent segment of New Haven, the percentage of black teachers and certified education staff in the PMSA. In an area with a sizeable black population, the failure to hire a black employee cannot be explained as a normal variance, but rather, supports an inference of discrimination. *NAACP v. Town of East Haven,* 70 F.3d 219; 225(2d Cir.1995) (citing *Teamsters,* 431 U.S. at 335 n. 15); See

*United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. United Bhd. of Carpenters and Joiners,* 457 F.2d 210, 214(7th Cir.) cert. denied 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972).

The Town has offered evidence of non-discrimination in all specific hiring. Police and fire examinations, of which there was evidence, have not necessarily been so validated. Questions about their formulation were not suggestive of negative impact on blacks alone, or even substantially. Though fire fighting experience would advantage a fire fighter examinee, testing in 1995, the advance preparation offered could have added to any examinee's ability to test successfully. Such experience was not calculated to disadvantage blacks. Defendants' evidence has pointed to proper filling of Town jobs, asserting the concept of justified business necessity and relation to the job. However, that tack does not deal with the question of the minority community's perception that the Town is not open to hiring blacks and the consequent paucity of qualified black applicants. Causation is not necessarily determined by discrimination on a particular minority applicant. *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 605–06 (1st Cir.), cert. denied, 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

Plaintiff has proven that the minimal hiring of blacks results from factors which would explain black reluctance to seek Town employment. These include the low percentage of black residents in the Town, nearly non-existent Town black employment, lack of black success in seeking Town employment, and the substantial number of hirees who were Town residents and/or had an affiliation with Town officials or political activists. The focus of the firefighter test on practical skills, resulting in appointment of 8 out of 10 hires from the ranks of Town volunteer fire fighters, who were and normally would be Town residents, suggests disfavor to outsiders. These factors, coupled with the undisputed dearth of qualified black job applicants, tend to confirm plaintiffs' claim of a black perception of being unwelcome in the Town. It is

psychologically foreboding for a black to seek jobs in dominantly, if not exclusively, white employment ranks.

Plaintiffs have not proven concerted, active discrimination against black job applicants. What plaintiffs have proven is that blacks are not being hired because they are discouraged by the hiring process. Race is a factor in hiring if factors which bring race to the fore significantly discourage black applications. For a black who does not enter into the hiring process because that process is fearsome or discomforting to him on account of his race, the factors which create that fear or discomfort are as much preclusive of his getting an equal opportunity to be considered for the job as would be an outright, declared refusal to hire him based on his race. A record of zero black hiring makes a finding of discrimination irresistible, "notwithstanding the lack of a specific unsuccessful minority applicant." *Steamship Clerks*, 48 F.3d at 605.

■ To dispel the perception, and to give credibility to the Town's asserted welcome to black job applicants, a remedy which overcomes, or tends to neutralize, race as a lurking element is warranted.[5] Even absent affirmative conduct of a discriminatory nature, recruiting (or non-recruiting) which has a discriminatory effect is not an improper basis for relief. *Chicago Miniature Lamp Works*, 947 F.2d at 298–99.

The limited evidence of apparent individual indifference is not deemed probative of a general black disinterest. It certainly may be a factor, but what has been shown is that the perception of the Town in the black community is a real factor. The relief sought does not request a quota, nor that specific jobs go to blacks, but rather it seeks an outreach program which would, hopefully, overcome the inhibitions which have discouraged qualified blacks from seeking Town employment in numbers representative of the makeup of the black community. Such relief is properly based on conduct which, though not proven to have been overtly or intentionally discriminatory, is facially neutral but has a disparate impact on a particular group. *Teamsters*, 431 U.S. at 365 n. 15. This is in keeping with the prophylactic objective of Title VII, which is to "achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees," by fashioning the most complete relief to achieve that result. *Id.* at 364 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs*, 401 U.S. at 429–30).

■ An employer need not hang out a "whites only" sign to discourage black applicants. The message may be heard in the form of treatment of applicants, publication of openings, recruitment techniques, and "even by the racial or ethnic composition of that part of [the] work force" from which minorities have been excluded. *Teamsters*, 431 U.S. at 365. "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* at 365–66. Granting such relief has the salutary effect of not permitting discrimination to perpetuate itself. *Newark Branch, NAACP v. Town of Harrison, New Jersey*, 940 F.2d 792, 807 (3d. Cir.1991) (approving relief in the form of advertising and recruitment measures to redress disparity) (citing *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 476, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)).

This is not a case of merely looking at the bottom line although the complete lack of hiring of blacks by the Town is certainly a significant factor in the analysis. Rather, the bottom line is enhanced by the evidence of inhibition in the black community which is

**5.** Defendants' position with respect to this matter, while not conceding any wrongdoing, is not inconsistent with this conclusion. The Town's Mayor, Mr. Luzzi, testified in apparent good faith that he was disturbed by the claimed perception in the black community that blacks were unwelcome as employees of the Town. He attributed the perception "to lack of information about the town." Defs. Post-trial Memorandum at 33. The remedy ordered would, largely, go a long way to rectify the lack of information about the Town's openness to applications for employment from the black community, and hopefully dispel the negative perception, which Mayor Luzzi asserted is wrong and wished to correct.

found to have been a factor in the paucity of black applicants. Defendants have pointed to the paucity, but have gone no further. There is no evidence to support a race neutral explanation for the paucity. There is no evidence of blacks being averse to government employment. There is evidence that in the circumstances of its hiring processes, the Town has inadequately addressed its perception in the black community. It is appropriate to require the Town to elevate its outreach to the black community by advertising and recruiting in a manner and to a degree that hopefully will elevate the number of qualified blacks seeking Town employment substantially, such that applying blacks, competing equally with all applicants, can succeed in the hiring process. This will provide the black community with an opportunity to achieve a greater level of black Town employment by encouraging applications from representative members of the black community capable of competing successfully for Town jobs. It guarantees no jobs. It will level the playing field in the mind of the black community. It should encourage blacks to compete for Town jobs by convincing them of equal treatment in the Town's job application processing. This is totally in keeping with the Town's stated goal of equal employment opportunity. It is also consistent with the concept of outreach which the Town claims to espouse. However, by the remedy ordered herein, the Town will be required to make a more concerted outreach effort, which it has expressed a willingness to negotiate. This is not to fault the Town for discouraging black applications, but for failing to encourage such applications to overcome the negative perception of the Town in the black community.

## V. REMEDY

Plaintiffs have offered a Proposed Decree. The Town is afforded two weeks from the date hereof to address plaintiffs' specific proposals. The Court will thereupon formulate a specific order consistent with the forgoing discussion.

SO ORDERED.